**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾                          :

                             :

DESMOND CLARK and CELESTE    :
CLARK, as parents/guardians for a minor,  :
DAYSHON CLARK,                  :
                             :
        Plaintiffs,            :       Civil Action No. 06-2736 (FLW)
                             :
        v.                   :
                             :       **OPINION**
BOARD OF EDUCATION OF THE    :
FRANKLIN TOWNSHIP PUBLIC     :
SCHOOLS, ANTHONY CAPAROSO,  :
et al.,                     :
                             :
        Defendants.          :
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾   :

**WOLFSON, United States District Judge:**

       Presently before the Court is a motion for summary judgment by Defendants, Board of

Education of the Franklin Public Schools (the "School District") and Vice Principal Anthony

Caparoso ("Caparoso") (collectively "Defendants"), to dismiss the Complaint of Plaintiffs,

Desmond Clark ("Mr. Clark") and Celeste Clark ("Ms. Clark"), as parents/guardians for their

minor son, D.C., (collectively "Plaintiffs" or the "Clarks").  Plaintiffs allege that Defendants

racially discriminated against D.C. by issuing suspensions that were grossly out of proportion to

his conduct in violation of 42 U.S.C. §§ 1981, 1983, 1985(2) and the New Jersey Law Against

Discrimination, N.J.S.A. 10:5-1, et. seq.  Plaintiffs seek compensatory damages, exemplary or

punitive damages, interest, and attorney's fees and costs.  Defendants argue that they are entitled

to judgment as a matter of law, pursuant to Fed. R. Civ. P. 56, because their actions were not

racially motivated and thus did not violate D.C.'s rights.  Further, Defendants argue that

Plaintiffs are not entitled to exemplary or punitive damages because Defendants did not act in a

wanton or willful manner in suspending D.C.  Plaintiffs filed an Opposition to Defendants'

Motion.  For the reasons that follow, the Court denies Defendants' Motion for Summary

Judgment on Plaintiffs' § 1983 and NJLAD claims against Caparoso, but grants their Motion

with respect to Plaintiffs' §§ 1981 and 1985 claims against Caparoso.  Further, the Court grants

the Motion on all claims against the School District.


I.      BACKGROUND AND PROCEDURAL HISTORY

        On June 16, 2006, the Clarks, as parents/guardians for their son D.C., filed this lawsuit

alleging that the School District and Vice Principal Anthony Caparoso[1] subjected D.C. to "the

embarrassment and humiliation of severe discipline in the form of excessive suspensions from

school" because he is African-American in violation of 42 U.S.C. §§ 1981, 1983, 1985(2) and

the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, et. seq.[2]

        In January of 2003, the Clarks sought to have D.C. evaluated by the School District for

learning and developmental disabilities to see if he was eligible for enrollment in the preschool

---

[1]It is unclear from Plaintiffs' Complaint whether they intended to sue Caparoso in both his official capacity and individual capacity.  Plaintiffs simply allege that at all times relevant to the case Caparoso was the Vice Principal at Franklin Park Elementary School.  Compl. ¶ 9.  In their brief, however, Plaintiffs argue that Caparoso acted in his official capacity, and never contend that they have sued Caparoso in his individual capacity.  For example, Plaintiffs claim that "[a]cting under the mantle of his position as Vice-President", Caparoso engaged in this discriminatory conduct.  Pls. Opp. at 33.  Therefore, the Court finds that Plaintiffs have sued Caparoso in his official capacity alone.

[2]Plaintiffs do not assert that Caparoso treated D.C. differently because of his disability nor do they assert any claims under the Americans with Disabilities Act.

disabled program.  Curley Aff., Ex. 1, Letter from R. Perez to C. Clark, dated Jan. 7, 2003

("PX1").  The School District arranged for D.C. to be examined by the preschool psychologist

and occupational therapist, consistent with the standard evaluation protocol.  Curley Aff., Ex. 2,

Psych. Eval. ("PX2"); Ex. 6, Occupational Therapy Eval., 2003 ("PX6").  Examiner Victoria

Nostrand, M.A. ("Nostrand") conducted D.C.'s psychological evaluation in February and March

of 2003 for the School District and found that D.C. was developmentally/learning disabled, he

had difficulty keeping calm, and he was "somewhat aggressive as he screamed with resistance,

and repeatedly head-butted his mother in the legs."  PX2.  Although D.C. was three years old

when evaluated, he was functioning at a level "similar to that of a child of 2 years, 1 month."  Id.

The Franklin Park School (the "School") staff, in consultation with the Clarks,

determined that D.C. was eligible for special education services under the disability category of

"Preschool Disabled".  Df. Ex. 4, Annual Review, IEP Implementation dated 1/7/04 ("DX4").

Pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et. seq. ("IDEA"),

the School considered various options when planning D.C.'s Individualized Education Plan

("IEP").  DX4.  In the Annual Review IEP Implementation dated December 1, 2003 ("2003

IEP"), the School District wrote that D.C. "has a tendency to be overactive and impulsive . . .

[which has] resulted in other's being hurt."  Curley Aff., Ex. 9, Annual Review, IEP

Implementation dated 12/1/03 ("PX9").  Based on D.C.'s impulsive behavior and special needs

for behavior management, the School District developed an IEP to provide D.C. with an

appropriate education and implemented the IEP on January 7, 2004 ("2004 IEP").  Df. Facts ¶ 3;

DX4. By a letter dated January 13, 2004, Alex Duroy, D.C.'s Case Manager, provided this 2004

IEP to the Clarks in writing, which his parents reviewed and signed, acknowledging, inter alia,

that Plaintiff was not exempt from the School District's 2003-04 Student Code of Discipline (the "2003-04 Code").[3]  Curley Aff., Ex. 12, Letter from A. Duroy to the Clarks ("PX12"); DX4 .

Born on August 20, 1999, D.C. was four years old when he was enrolled in the Pre-Kindergarten program at the School pursuant to this 2004 IEP.  PX2; DX4; Df. Facts ¶ 3.[4]  The parties dispute whether it was within the School District's policy to allow the suspension of disabled pre-school children in the 2003-2004 school year.  Df. Facts ¶ 5; Pl. Facts ¶ 3. Defendants rely on the suspension guidelines for Level 3 violations of the 2003-04 Code in connection with their decision to suspend D.C.  Curley Aff., Ex. 8, Student Code of Discipline ("PX8").[5]  The parties do not dispute that consistent with N.J.A.C. 6A:14-2.8(a)(1), the School District clarified its written policy in 2006, so as to prohibit the suspension or expulsion of

_____

[3]Plaintiffs, however, deny that, by signing the 2004 IEP in April 2004, they consented to allowing the School District to suspend D.C.  Pl. Facts ¶ 3.

[4]The parties dispute the date of enrollment.  According to the modified IEP dated November 24, 2003, D.C. was transferred to the School in late November 2003, and began his IEP program on December 1, 2003.  PX9.  In addition, the Daily Behavior Summary forms prepared by the School begin on December 1, 2003.  Curley Aff., Ex. 10, Daily Behavior Summaries ("PX10").  Defendants, however, assert that he was enrolled in school beginning January 7, 2004.  Df. Facts ¶ 3.
The parties further dispute when D.C. began displaying aggressive behavior.  Defendants state that D.C. began exhibiting aggressive behavior after enrolling at the School.  Df. Facts ¶¶ 3-4.  Plaintiffs, however, state that D.C.'s aggressive behavior began well before this time, directing the Court to look at D.C.'s indicated developmental disabilities, the 2004 IEP's primary objective to modify D.C.'s aggressive behavior, and the Daily Behavior Summaries from December 1, 2003 through the beginning of 2004.  PX10; Pl. Facts. ¶ 4.  The Court notes that Defendants' own exhibit indicates that D.C.'s aggressive behavior in 2003 qualified him as "Preschool Disabled."  DX4.
These discrepancies are not material on this motion.

[5]The Court notes that the text of the 2003-04 Code does not explicitly address the suspension of a preschool disabled child.  PX8 at 17.  Rather, Level 3 infractions cited by Defendants only provide guidelines for suspending students in grades Kindergarten through Twelve.  Id.

4

preschool disabled students consistent with the findings of the New Jersey Department of
Education, which expressly found that suspension or expulsion of preschool disabled students
was improper:

> The Department has determined that suspension or expulsion of preschool students with
> disabilities is inappropriate in any circumstance due to the children's young age and
> potential lack of understanding of the consequences of their inappropriate behavior.
> Behavior intervention and other appropriate programmatic alterations or changes should
> be considered and utilized to address inappropriate behaviors from preschool disabled
> students.

38 N.J.Reg. 3530(b) (Sept. 5, 2006).

On February 4, 2004, D.C. head-butted and kicked a teacher in the left shin.  See Curley
Aff., Ex. 13, Incident Referral Form, dated Feb. 4, 2004 ("PX13"); Df. Ex. 5 ("PX5").  On
February 10, 2004, D.C. again head-butted a teacher.  See PX10.  No disciplinary action was
taken for these incidents.  Pl. Facts ¶ 9.  On February 27, 2004, D.C. jumped on another child's
back and pushed that child's head onto the carpet.  See Df. Ex. 6, Incident Referral Form, dated
Feb. 27, 2004 ("DX6").  According to Defendants, pursuant to the 2003-04 Code, D.C. received
a one day suspension from school.  See Curley Aff., Ex. 14, Notice of Suspension, dated Mar. 2,
2004 ("PX14"); Df. Ex. 8 ("DX8"); Df. Facts ¶ 5.[6]

On March 24, 2004, D.C. was observed grabbing the neck of a teacher, Susan Rudin
("Rudin"), and pushing her off a chair from behind.  See Curley Aff., Ex. 15, Incident Referral
Form, dated Mar. 24, 2004 ("PX15").  For this incident, D.C. initially received a five-day
suspension, which Caparoso then increased to nine days. See Curley Aff., Ex. 20, Notice of

---

[6] Caparoso issued two different Notices of Suspension on March 2, 2004; Plaintiffs state
that this demonstrates that he manufactured the nature of the alleged incident on February 27,
2004 because the initial reason "Disruptive Behavior" did not appear serious enough to justify
suspension.  See PX14; Pl. Facts ¶ 5.

Suspension, dated Apr. 19, 2004 ("PX20"); Df. Ex. 10 ("DX10").[7]  Caparoso indicated on a

Notice of Suspension, dated April 19, 2004, that the nine-day suspension, which ended on April

12, 2004, was "mandatory."  PX20.

The School District had a Manifestation Determination, dated April 19, 2004, which

found that D.C. "displays impulsive behavior, resulting in aggressive acts that he appears to be

unable to control", and such "behavior, which resulted in a 9 day suspension[,] is a manifestation

of his disability."  Curley Aff., Ex. 21, Manifestation Determination ("PX21 - MD").  It further

stated that "the current placement for D.C. is appropriate at this time . . . based on data collected

and observation of staff members whom [sic] work with [D.C.]; he does not appear to understand

the consequences of his behavior."  Id.  The School District wrote a Behavior Intervention Plan

("BIP") to address D.C.'s aggressive behavior that resulted in disciplinary action and the BIP was

to be reviewed by the participants for a progress determination on May 19, 2004.  Id.; Curley

Aff., Ex. 21, Behavior Intervention Plan ("PX21 - BIP").  Caparoso was listed as a member of

the disciplinary review team that came to these conclusions.  PX21 - MD.

On May 7, 2004, D.C. again showed signs of aggressive behavior in class by grabbing a

teacher's leg and refusing to let go.  See Df. Ex. 11, Incident Referral Form, dated May 7, 2004

("DX11").  On June 8, 2004, D.C. punched another student in the head with a closed fist while

---

[7]Defendants contend that the length of the suspension was increased when the severity of
the infraction was fully known.  Df. Facts ¶ 6.  Plaintiffs, however, state that this is inaccurate
because Caparoso knew the full extent of the alleged incident immediately, and increased the
length of the suspension because of his racial animus toward D.C.  Pl. Facts ¶ 6.  Plaintiffs also
dispute the allegations around the alleged March 24, 2004 incident because there are various
versions, some "nonsensical", of what happened.  Id.; PX10; PX15; PX17.  Caparoso testified
that he initially imposed a five-day suspension, but changed it to nine days upon the
recommendation of the director of special education, Hank Sherren.  Caparoso Dep. 82:20-83:4,
97:9-23.

they were sitting on the carpet for circle time, see Df. Ex. 13, Incident Referral Form, dated June 8, 2004 ("DX13"), for which D.C. received a one day suspension on June 10, 2004.  See Df. Ex. 14, Notice of Suspension, dated June 10, 2004, ("DX14").[8]  On June 10, 2004, D.C. also head-butted Michele Sidwell in the rear end in front of Ms. Clark and Dena Febus.  Curley Aff., Ex. 24, Incident Referral Forms, dated June 10, 2004 ("PX24").  Then on June 16, 2004, D.C. was suspended for five days because he hit a teacher in the back with his head.  See Curley Aff., Ex. 27, Notice of Suspension, dated June 16, 2004 ("PX27").  According to Plaintiffs, prior to Caparoso's involvement, D.C.'s manifestation of his disability through aggressive behavior was handled without disciplinary suspensions.  Pl. Facts ¶¶ 4-5, 7; PX10.

As the Vice Principal at the Franklin Park Elementary School since October 13, 2003, Caparoso was responsible for disciplining the children in the preschool program.[9]  Curley Aff., Ex. 30, Caparoso Dep. ("Caparoso Dep.") 9:23-10:3, 14:18-15:22.  Caparoso did not possess qualifications or training in the education or discipline of developmentally/learning disabled children, see id. 10:4-17:3, 83:10-13, nor was he part of the School District IEP team that made D.C.'s education plan.  See PX4, PX9, PX11.  Caparoso testified that he did not have a reason to believe that D.C. even understood the suspensions were intended to punish him.  Caparoso Dep. 58:11-23.  Caparoso could not recall if he had ever suspended any other preschoolers, and admitted that he never imposed a nine-day suspension on a preschool child aside from D.C.  Id.

---

[8]Plaintiffs also charge Caparoso with doctoring internal records – involving the March 24, 2004 and June 8, 2004 incidents – to show that D.C. was suspended for fewer days than actually imposed.  Pl. Facts ¶ 8 (citing PX20 & PX29).

[9]D.C. was allegedly the only African-American student in the preschool disabled program at Franklin Park Elementary in 2004.  Curley Aff., Ex. 31, C. Clark Dep.  ("C. Clark Dep.") 29:7-10.

98:2-99:10.  Caparoso could not recall ever suspending a preschool disabled child other than

D.C.  Id. 21:4-25, 86:1-9.[10]  The parties do not dispute that Caparoso suspended D.C. for a total

of more than sixteen days between March 2, 2004 and June 16, 2004.  Caparoso testified that he

was unaware of what was set forth in the 2003-04 Code, he was unaware that it was illegal from

2006 forward to suspend a preschool disabled child pursuant to N.J.A.C. 6A:14-2.8(a)(1), and he

was unaware that the 2007-08 School District Code of Conduct ("2007-08 Code") expressly

prohibited the suspension of a preschool disabled child until it was raised at his deposition in

May of 2008.  Id. 16:6-18:13, 22:4-8; 23:16-25:10, 32:21-34:9; see Curley Aff., Ex. 28, 2007-08

District Code of Conduct ("PX28").

    As part of an ongoing review of D.C.'s education plan, in June 2004 the School District

concluded that "D.C. has not yet demonstrated a definite understanding of cause and

consequence of his actions" in an IEP Reevaluation Classification Summary Report.  Curley Aff.,

Ex. 34, Reevaluation Classification Summary Report ("PX34") at 71.  The School Officials met

with the Clarks and Darryl Griffin ("Griffin"), an alleged third-party witness, to discuss D.C.'s

2004 Annual Review on June 16, 2004.  Id.  According to Plaintiffs, after this meeting, Messrs

Clark and Griffin went to Caparoso's office at the School to get copies of suspension paperwork,

and while in the hallway outside Caparoso's office, Messrs Clark and Griffin heard Caparoso

say, "I don't like that little black kid, he reminds me of one of those little black kids in the

---

[10]Thus, the only preschool disabled child ever suspended by Caparoso was Plaintiff, an
African-American child.  C. Clark Dep. 28:23-29:14.  Plaintiffs, however, note that although the
School District provided records that appear to indicate there were other African-American
preschool students, there was no distinction in the School District records as to the racial
breakdown of enrollment in the preschool disabled program.  Pls. Opp. 11 n. 3 (citing PX25).
Defendants admit that the School District records do not delineate the race of the students or
identify any disabilities that a student may possess.  Df. Reply at 5.

ghetto." Curley Aff., Ex. 32, D. Clark Dep. ("D. Clark Dep.") 89:14-91:16; 94:8-99:9, Griffin

Aff. ¶ 2.[11]   After this alleged incident, in June of 2004, the Clarks took their complaints regarding

the manner in which Caparoso was imposing disciplinary suspensions on D.C. to the School

District Superintendent, William Westfield ("Westfield").   Griffin also accompanied the Clarks

to a meeting with Westfield and Hank Sherren, in which Westfield allegedly said that the School

District's discipline policies with respect to suspensions did not apply to four-year-old preschool

children like D.C.   Griffin Aff. ¶ 3; Curley Aff., Ex. 31, C. Clark Dep. ("C. Clark Dep.") 31:19-

34:2, 83:9-23; D. Clark Dep. 84:17-85:15, 87:23-88:7.   Allegedly, Westfield also acknowledged

that mistakes were made in the way D.C. was treated.   Id.

After the meeting with Westfield in June 2004, the School District – at its expense –

arranged to have D.C. sent to an out-of-district school, Titusville Academy ("Titusville"), which

specializes in serving the needs of students prone to emotional and behavioral difficulties.   C.

Clark Dep. 40:4-41:13; Df. Reply at 6.   Since entering Titusville, D.C. has displayed

improvement in his disabilities, received awards recognizing his achievements, and he has not

been suspended nor sent home for disciplinary reasons.   C. Clark Dep. 35:16-36:8, 37:14-22;

Curley Aff., Ex. 33, President's Education Award ("PX33").

Although Plaintiffs do not allege that D.C. has suffered permanent, life-long scares, they

---

[11]According to Griffin, when he and Mr. Clark appeared in the doorway, Caparoso looked surprised and embarrassed, and Mr. Clark told Caparoso something that to the effect that if his statement referred to D.C., which to both of them appeared clear, he would pursue his rights in court.   Griffin Aff. ¶ 2.   Caparoso allegedly did not respond; Messrs Clark and Griffin picked up the paperwork and left.   Id.   In contrast, Caparoso testified that he did not recall Griffin being present at the meeting nor any of the other alleged events, including Mr. Clark going back to his office, Caparoso making such a racial remark, or Mr. Clark saying that he would see him in court.   Caparoso Dep. 132:1-134:14.

do claim that D.C. and his family suffered emotional distress at the time of the events in 2004 and that there are lingering effects on D.C.  D.C. did not want to go to school, ride the bus, and suffered nosebleeds, and asked if he could stop going to school or go to his sister's school.  D. Clark Dep. 104:22-107:10.  Allegedly, D.C. is prone to panic attacks if he perceives the slightest indication that he could be in trouble.  C. Clark Dep. 40:4-41:13.

On November 4, 2008, Defendants filed a motion for summary judgment to dismiss Plaintiffs' claims on the grounds that their actions were not racially motivated and thus did not violate D.C.'s rights.  Plaintiffs opposed the motion arguing that Defendants took disproportionate disciplinary action because of D.C.'s race.  For the reasons stated herein, Defendants' Motion is granted in part and denied in part.  Plaintiffs may proceed with their § 1983 and NJLAD claims against Caparoso and may also seek punitive damages under the NJLAD.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A fact is material only if it might affect the outcome of the suit under the applicable rule of law.  Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id. The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment.  Celotex, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.

10

R. Civ. P. 56(e).  To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324.  In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999).  A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party."  Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

The motion is appropriately granted when that party is entitled to judgment as a matter of law.  Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. V.I. 1990).  Even if a record contains facts that might provide support for a non-movant's position, "the burden is on the [non-movant], not the court, to cull the record and affirmatively identify genuine, material factual issues sufficient to defeat a motion for summary judgment."  Morris v. Orman, No. 87-5149, 1989 WL 17549, at *8 (E.D. Pa. Mar. 1, 1989) (citing Childers v. Joseph, 842 F.2d 689 (3d Cir. 1988)); see also Atkinson v. City of Phila., No. 99-1541, 2000 WL 793193, at *5 n. 8 (E.D. Pa. June 20, 2000).

## III.    DISCUSSION

In this civil rights action, Plaintiffs allege that Defendants violated D.C.'s civil rights

under the United States Constitution[12] in violation of 42 U.S.C. §§ 1981, 1983, and 1985, and the NJLAD when they allegedly discriminated against D.C. by imposing suspensions from school because he was African-American.  The Court will address Defendants' arguments with respect to each claim in turn.

###### A.      Plaintiffs' § 1981 Claims Against Defendants

The First Count of Plaintiffs' Complaint alleges violations of D.C.'s rights pursuant to 42 U.S.C. § 1981.  Section 1981 provides, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State or Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other."  42 U.S.C. § 1981.  Section 1981(c) states that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."  In order to state a claim under § 1981, plaintiffs must establish "facts in support of the following elements: (1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts . . . ."  Brown v. Phillip Morris, Inc., 250 F.3d 789, 797 (3d Cir. 2001).  A showing of disparate impact is insufficient because § 1981 only provides a cause of action for intentional

---

[12]In their Complaint, Plaintiffs also reference the New Jersey Constitution, generally, however, they do not assert any claims under the New Jersey Constitution.

discrimination.  Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 562 (3d Cir. 2002).

In the instant case, Plaintiffs do not contend that they have met all three elements necessary to establish a violation of § 1981 nor do they refute Defendants' assertions that they fail to demonstrate a claim here.  Because Plaintiffs fail to present evidence raising a genuine issue of material fact with respect to one or more of the activities enumerated in the statute, the Court dismisses Plaintiffs' § 1981 claim against all Defendants.[13]

### B.      Plaintiffs' § 1983 & NJLAD Claims

Plaintiffs bring a § 1983 claim in the First Count and a NJLAD claim in the Second Count of their Complaint against Defendants.  Although Defendants jointly assert all of their arguments against Plaintiffs' § 1983 and NJLAD claims, the Court finds that it is necessary to

---

[13]Even if, however, Plaintiffs did present such evidence in this case, the Court would summarily dismiss Plaintiffs' claims here.  In a case where a coach asserted a race discrimination claim against a school district, the Supreme Court held that § 1981 does not create an implicit cause of action against state actors such as the school district under the statute.  Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 731-32 (1989).  In 1991, Congress added two new subsections to § 1981 to include sections (b) & (c); however, circuits are split on whether section (c) creates a private cause of action against state actors and thus overrules Jett.  See Arendale v. City of Memphis, 519 F.3d 587, 596 (6th Cir. 2008 )(citing cases).  After conducting an inquiry as to whether Congress intended section (c) to create a private remedy in addition to a private right, the Court of Appeals for the Sixth Circuit determined that "'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units' . . . [and thus] no independent cause of action against municipalities is created by § 1981(c)."  Id. (quoting Jett, 491 U.S. at 733).  The Ninth Circuit, and the only Court of Appeals that has permitted a remedy against municipalities under § 1981, held that the rights protected by § 1981 are coextensive with those already protected by § 1983.  See Id. at 599 n. 9; Federation of African American Contractors v. City of Oakland, 96 F.3d 1204, 1214 (9th Cir. 1996).  Thus, the Court finds that even if § 1981 permits Plaintiffs to assert their race discrimination claims against such municipal defendants, it would be inappropriate to allow them to pursue such claims here where they are asserting the same claims under § 1983.

address Plaintiffs' claims with respect to each Defendant separately.  First, the Court addresses

Plaintiffs' § 1983 and NJLAD claims against the School District and then against Vice Principal

Caparoso.[14]

Section 1983 of Title 42 of the United States Code authorizes a person such as Plaintiff to

seek redress for a violation of his federal civil rights by a person who was acting under the color

of state law.  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of
> any State or Territory . . . . subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  To recover under 42 U.S.C. § 1983, a plaintiff must show two elements: (1) a

person deprived him or caused him to be deprived of a right secured by the Constitution or laws

of the United States, and (2) the deprivation was done under color of state law.  See West v.

Atkins, 487 U.S. 42, 48 (1988); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970); Sample

v. Diecks, 885 F.2d 1099, 1107 (3d Cir. 1989).  "To bring a successful claim under 42 U.S.C. §

1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful

discrimination."  Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992) (citations

_____

[14]The parties also address Plaintiffs' § 1983 and NJLAD claims together.  The New
Jersey legislature enacted NJLAD to eradicate "the cancer of discrimination."  Jackson v.
Concord Co., 54 N.J. 113, 124, 253 A.2d 793, 799 (1969).  The Supreme Court of New Jersey
has "generally looked to standards developed under federal anti-discrimination law for guidance
in construing the [NJ]LAD."  McKenna v. Pacific Rail Serv., 32 F.3d 820, 827 (3rd Cir. 1994)
(citing Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 600, 626 A.2d 445, 452 (1993)).  As the
parties raise the same issues and defenses with respect to Plaintiffs' claims that Defendants
violated their equal protection rights under the laws of the United States and the NJLAD, the
Court analyzes the parties' arguments together herein as Plaintiffs' § 1983 claims.

omitted).  Plaintiffs must demonstrate that they "receiv[ed] different treatment from that received

by other individuals similarly situated."  Id.  Because Plaintiffs allege race discrimination, they

must show that any disparate treatment was based upon their race.  See Rembert v. Monroe Twp.

Bd. of Educ., No. 95-4818, 1997 WL 189318, at *6 (D.N.J. Apr. 14, 1997).

       The NJLAD provides in relevant part: "All persons shall have the opportunity to

obtain . . . all the accommodations, advantages, facilities, and privileges of any place of public

accommodation . . . without discrimination because of race . . .  This opportunity is recognized as

and declared to be a civil right."  N.J.S.A. § 10:5-4.  The statute further imposes liability on any

person who "aid[s], abet[s], incite[s], compel[s], or coerce[s] the doing of any of the acts

forbidden under this act, or [who] attempts to do so."  N.J.S.A. § 10:5-12(e).

       **1.**    **Entity Liability**

       While a local government entity "cannot be held liable solely because it employs a

tortfeasor", Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. at 658, 691 (1978), it

can be found liable under § 1983 if certain criteria are met.  To state a cause of action against a

School District under § 1983 for a vice-principal's deprivation of a student's constitutional

rights, a plaintiff must plead and prove that his injury resulted from an "official custom or

policy" of the school district, which was a driving force behind the vice-principal's actions.  Id.

at 658.  "It is when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts and acts may fairly be said to represent official policy,

inflicts the injury that the government as an entity is responsible under § 1983."  Id. at 694.

Thus, for Plaintiffs to prevail on their claims against the School District, Plaintiffs must show

that: (1) there was a violation of D.C.'s constitutional rights pursuant to an official policy,

custom, or practice; and (2) the School District's policy or custom caused the violation.  See Cain v. Tigard-Tualatin Sch. Dist., 262 F. Supp. 2d 1120, 1131 (D. Or. 2003) (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989); Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. at 658, 691 (1978)).  A school district, however, may not be held liable in a § 1983 action under the theory of respondeat superior.  Monell, 436 U.S. at 691.  It is for the jury to determine whether the official policymakers of the entity, such as the school board members, caused the deprivation of rights at issue through policies or customs that constitute standard operating procedure of the entity.  See Id. (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989)).  Therefore, to find a school district liable under § 1983, it must have done more than employ the offending employee, i.e. the principal, coach, or teacher.  See Id.  Instead, the plaintiff must show that an official policy or custom enabled the misconduct to continue even if the policy did not receive "formal approval through the body's official decision make channels" to hold the entity liable.  See Id. (citing Monell, 436 U.S. at 691).  The plaintiff may also recover if the evidence shows that the need to act is so obvious that the school district's failure to act could be said to amount to an official policy of inaction.  See Williams ex rel. Hart v. Paint Valley Local Sch. Dist., 400 F.3d 360, 369 (6th Cir. 2005).

Here, Plaintiffs do not allege that Defendants had a pattern or practice of intentional discrimination and Plaintiffs concede that they do not assert that the School District was engaged in District-wide racial discrimination.  Pls. Opp. at 31.  Rather, Plaintiffs admit that their "claims of racial discrimination are particular to Caparoso", who allegedly "singled out [D.C.] for disparate treatment . . . out of his own visceral racial prejudices."  Id.  Further, Plaintiffs do not allege or present any evidence that the School District failed to adequately address Plaintiffs'

16

concerns or deal with the problems raised upon their knowledge of Plaintiffs' concerns with

Caparoso's conduct.  Cf. Cain, 262 F. Supp. 2d at 1131-32 (plaintiffs adequately stated a claim of

entity liability where they alleged that "the school district learned of [the coach's] conduct, failed

to investigate plaintiffs' accusations, and did not properly discipline [the coach] for his

misconduct. . . ."  The plaintiffs charged that the district's official policy, practice, and custom

was to inadequately supervise and discipline the coach and the district officially approved of the

coach's conduct by failing to properly respond to their complaints.  Id.).  In this case, Plaintiffs

do not make any allegations that the School District affirmatively acted in a discriminatory

manner.  At best, Plaintiffs contend that the School District "tacit[ly] approved" Caparoso's

allegedly racially discriminatory conduct.  Pls. Opp. at 31, n. 7.  However, all of the evidence

Plaintiffs have presented is to the contrary.

According to Plaintiffs, they raised their concerns with Caparoso's actions at a meeting in

June of 2004 with the School District's Superintendent William Westfield, Hank Sherren, and

Griffin.  At that time, Westfield allegedly acknowledged that mistakes were made in the way the

School District and Caparoso treated D.C. and said that the District's discipline policies with

respect to suspensions did not apply to four-year-old preschool children like D.C.  Griffin Aff.

¶ 3; C. Clark Dep. 31:19-34:2, 83:9-23; D. Clark Dep. 84:17-85:15, 87:23-88:7.  After the

meeting, the School District paid to have D.C. sent to Titusville, an out-of-district school that

specializes in serving the needs of students prone to emotional and behavioral difficulties, C.

Clark Dep. 40:4-41:13; Df. Reply at 6, where he has thrived.  C. Clark Dep. 35:16-36:8, 37:14-

22; PX33.

Plaintiffs do not offer any evidence that the School District or any school board members

ignored their concerns, failed to take any action to rectify the situation swiftly, or condoned Caparoso's alleged behavior.  Rather, Plaintiffs concede that after Westfield acknowledged that there had been mistakes with respect to the actions taken in D.C.'s case, the School District worked to meet D.C.'s needs by finding a more suitable placement.  Further, Desmond Clark testified that, other than Caparoso, no one said or did anything racially motivated.  D. Clark Dep. 99:10-14.  Thus, there are no genuine issues of material fact with respect to the School District's alleged violations of § 1983 or the NJLAD.[15]  Because, taking the evidence in the light most favorable to Plaintiffs, the non-moving party, no reasonable jury could find that the School District violated § 1983 or the NJLAD, the Court grants Defendants' Motion for Summary Judgment on these claims against the School District.

### 2.    Plaintiffs' § 1983 and NJLAD claims against Caparoso

Plaintiffs correctly note that their "claims of racial discrimination are particular to Defendant Caparoso and the suspensions he imposed on [D.C.]," Pls. Opp. at 31, and the Court addresses Plaintiffs' claims in this connection.  Plaintiffs claim that Vice Principal Caparoso racially discriminated against D.C. in violation of § 1983 and the NJLAD when he repeatedly suspended D.C. during the Spring of 2004 for demonstrating aggressive behavior in his preschool class.  Defendants argue that the undisputed material facts establish that Defendants acted in

---

[15]The parties here fail to raise any arguments as to why the NJLAD claim could remain when the § 1983 claim fails, and the Court is unaware of any case law that permits entity liability in this context, which would directly conflict with federal law.  Because the Supreme Court of New Jersey generally looks to standards developed under federal anti-discrimination law for guidance in construing the NJLAD, see McKenna v. Pacific Rail Service, 32 F.3d 820, 827 (3rd Cir. 1994) (citing Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 600, 626 A.2d 445, 452 (1993)), and federal law clearly prohibits liability of the School District for the actions of an employee in the absence of a policy or custom, the Court grants Defendants' Motion for Summary Judgment on Plaintiffs' NJLAD claim against the School District.

18

accord with the School District's 2003-04 Code, that in signing the IEP, Plaintiffs acknowledged that D.C. would be subjected to the 2003-04 Code, and that Plaintiffs have failed to present little, if any, evidence that Caparoso's actions were racially motivated.  Plaintiffs, however, argue that there is a question of fact with regard to whether Caparoso, acting as Vice President of the School, acted in accord with the School District's policies in suspending a preschool disabled child,[16] whether his actions were valid or reasonable, and whether his actions were racially motivated and thus, violated § 1983 and the NJLAD.  The Court agrees.

To controvert Defendants' arguments that Caparoso acted in accord with School District policy when he suspended D.C., Plaintiffs direct the Court to the 2003-04 Code, which expressly lists suspensions starting at the Kindergarten level, but includes nothing about suspending preschool children, let alone preschool disabled children.  See PX8.  In addition, Plaintiffs contend that the New Jersey Department of Education's policies, though unwritten in 2004, were the same as the those codified in 2006.  In 2006, the New Jersey Department of Education promulgated N.J.A.C. 6A:14-2.8(a)(1), which states that "preschool students with disabilities shall not be suspended, long-term or short-term, and shall not be expelled."  It determined that the "suspension or expulsion of preschool students with disabilities is inappropriate in any circumstance due to the children's young age and potential lack of understanding of consequences of their inappropriate behavior."  38 N.J. Reg. 3530(b) (Sept. 5, 2006).

Plaintiffs further argue that even if the State policy did not expressly state that the

---

[16]Plaintiffs argue that "if the District takes the position that their policy was to permit the suspension of preschool disabled children, then the District all but confesses that it discriminated against [D.C.] by suspending him based on his manifesting his disability."  Pls. Opp. at 29.  The Court notes, however, that Plaintiff does not assert claims of discrimination based on disability here.

suspension of a preschool disabled child was inappropriate in 2004, it was not the preferred

means of discipline by either the State or the School District at that time.  For support, Plaintiffs

direct the Court to the 2003-04 Code's silence on suspensions of preschoolers while providing

guidelines for suspending children in grades Kindergarten through Twelve.  In addition, Plaintiffs

present evidence that Westfield conceded during the meeting in June of 2004 with the Clarks and

Griffin that it was contrary to the School District's policies to suspend a preschool child such as

D.C.  C. Clark Dep. 31:19-34:2, 83:9-23; D. Clark Dep. 84:17-85:15, 87:23-88:7, Griffin Aff.

¶ 3.  Thus, there is a genuine issue of material fact as to whether the School District's 2003-04

Code permitted the suspension of a preschool disabled child.  This alone, however, would not be

a violation of D.C.'s rights under the Equal Protection Clause.  Cf. Goss v. Lopez, 419 U.S. 565

(1975).[17]

 Plaintiffs contend that D.C.'s suspensions were not based on valid policy mandates nor

logically connected to disciplinary considerations.  Rather, Plaintiffs assert that Caparoso, in his

official capacity as Vice Principal of Franklin Park Elementary School, deprived D.C. of his

Fourteenth Amendment Equal Protection rights by suspending him based on his race.  See West

v. Atkins, 487 U.S. 42, 48 (1988); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970);

Sample v. Diecks, 885 F.2d 1099, 1107 (3d Cir. 1989).  Defendants, however, argue that

Plaintiffs have presented little, if any, evidence that Caparoso's actions were racially motivated.

 Defendants further argue that no facts establish the required purposeful intent to

_____

[17]The Court notes that Plaintiffs do not bring any substantive due process claims.

20

discriminate against D.C.[18] on the basis of race.  Although § 1983 claims do not ordinarily

require proof of intent or state a mind, <u>Bethesda Lutheran Homes and Servs. v. Leean</u>, 154 F.3d

716, 718-19 (7th Cir. 1998), "[p]roof of racially discriminatory intent or purpose is required to

show a violation of the Equal Protection Clause."  <u>Arlington Heights v. Metropolitan Housing</u>

<u>Corp.</u>, 429 U.S. 252, 265 (1977).  In this case, because Plaintiffs' challenge to Caparoso's

conduct is grounded in the Equal Protection Clause,[19] Plaintiffs must show that Caparoso acted

with a discriminatory intent.  <u>Id.</u>

      Plaintiffs offer Mr. Clark's testimony and Griffin's affidavit to support their contention

that Caparoso's actions were taken to intentionally discriminate against D.C. because of his race.

Plaintiffs argue that Caparoso imposed absurd and futile disciplinary suspensions because D.C.

"reminded him of him of those little black kids in the ghetto."  D. Clark Dep. 89:14-91:16, 94:8-

99:9; Griffin Aff. ¶ 2.  Defendants, however, attempt to dismiss this comment that Mr. Clark

---

[18]In their Reply, Defendants write that "[t]here are no facts to establish the required purposeful intent to discriminate against Desmond Clark on the basis of race".  Df. Reply at 4. The Court infers that this is a typographical error and Defendants meant to write "D.C." instead of his father, Desmond.

[19]The Fourteenth Amendment of the U.S. Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV. This is not a command that all persons be treated alike, but, rather, a direction that all persons similarly-situated be treated alike.  <u>See</u> <u>City of Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985).  "The Equal Protection Clause commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'"  <u>Vacco v. Quill</u>, 521 U.S. 793, 799 (1997).  "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race," <u>Washington v. Davis</u>, 426 U.S. 229, 239 (1976), or any other suspect classification.  <u>See, e.g.</u>, <u>Bakke v. California Bd.</u> <u>of Regents</u>, 438 U.S. 265, 289-90 (1978) ("the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color" and "racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination").

allegedly overheard as merely a self-serving statement.  Defendants argue that this allegation is based on three assumptions that cannot be proven because: (1) Mr. Clark may not have accurately heard the alleged statement; (2) if the statement is accurate, it may not have been made by Caparoso; and (3) if accurate and made by Caparoso, it may not have concerned D.C.  Df. Reply at 4.[20]

As a preliminary matter, this "self-serving statement" was allegedly overhead by both D.C.'s father and a third-party witness.  Both Messrs Clark and Griffin attest to similar circumstances surrounding this incident.  See pp. 9-10, supra.  Thus, the Court finds Defendants' argument that Plaintiffs fail to present any facts in support of their claim meritless; Plaintiffs offer sworn testimony from both D.C.'s father and a third-party witness to demonstrate that there is a genuine issue of material fact with respect to whether Caparoso suspended D.C. because "[he doesn't] like that little black kid, [who] reminds [him] of one of those little black kids in the ghetto."

Defendants argue that even if Caparoso made a racial epithet, it alone would not be sufficient to establish a cause of action for racial discrimination.  For support, Defendants cite to the lone case of Stearnes v. Bauer's Opera House, Inc., 788 F. Supp. 375, 378 (D. Ill. 1992).

---

[20]Essentially, Defendants argue that more specific evidence is required and cast doubt on the Clark and Griffin statements.  It is not appropriate, however, for Court to weigh the credibility of the witnesses or the veracity of the alleged statement at this time.  See Losch v. Borough of Parkesburg, Pa., 736 F.2d 903, 909 (3rd Cir. 1984) ("While summary judgment may be based on affidavits, conflicts of credibility should not be resolved on a hearing on the motion for summary judgment unless the opponent's evidence is 'too incredible to be believed by reasonable minds.' 6 J. Moore, Moore's Federal Practice ¶ 56.15(4), AT 56-524 (2D ED. 1976); SEE GENERALLY ID. AT 56-512.3-56-530.").  Instead, the Court must determine whether Plaintiffs raise a genuine issue of material fact with respect to whether Caparoso, acting under the color of state law, deprived or caused D.C. to be deprived of his rights.

That case is not binding nor persuasive, and is distinguishable from the instant case.  The Court in Stearnes determined that a dance bar did not violate the Civil Rights Act of 1964 even if the bar's manager or bouncer made racial remarks because there was no evidence that the defendant engaged in discrimination when admitting and serving certain patrons.  In contrast, in this case, Plaintiffs aver that more than just a racial epithet was made by Caparoso; they also offer evidence that Caparoso engaged in discrimination against the child that was the subject of the alleged epithet, i.e. Caparoso suspended D.C. because of his race.  D.C. was a disabled preschool student, who professionals determined was prone to aggressive behavioral issues.  According to Plaintiffs, when D.C. manifested his disability, Caparoso imposed harsher penalties on him than all other students because of his race.  The alleged racial epithet is not merely an offhanded comment, but rather meant to show Caparoso's alleged discriminatory motive behind the suspensions.  Therefore, Stearnes is inapposite.  Plaintiffs have presented evidence that raises a genuine issue of material fact as to whether Caparoso purposefully intended to discriminate against D.C. because of his race.

Defendants also argue that Plaintiffs have failed to present evidence that D.C. was treated differently from similarly situated students of other races.  However, Defendants' records of student suspensions do not delineate the race of the students or identify any disabilities that a student may have.  Accordingly, Defendants argue that Plaintiffs have failed to present any material facts to support their contention that D.C. is the only African-American disabled preschool child to be suspended.[21]   The Defendants are mistaken; having not produced records of

---

[21]In essence, Defendants argue that D.C. is a class of one, and as such, he cannot demonstrate that he was treated differently from similarly situated students of other races.  Even if this were Plaintiffs' contention, "[t]he Supreme Court has recognized a 'class of one' equal

suspensions by racial breakdown or disability and failing to provide any evidence demonstrating

that Plaintiffs' proffered testimony is incorrect, Plaintiffs raise a genuine issue of material fact in

connection with this contention.  Ms. Clark testified that D.C. was the only African-American

student in the preschool disabled program at Franklin Park Elementary in 2004, and the only

preschool disabled child ever suspended by Caparoso was African-American.  C. Clark Dep.

28:23-29:14.  Further, Caparoso, the individual responsible for disciplining preschool students at

the School since October 13, 2003, could not recall if he had suspended any other preschool child

or preschool disabled child at the School.  Caparoso Dep. 21:4-25, 86:1-9, 98:22-99:7.  He also

admitted that he never imposed a nine-day or longer suspension on any preschool child aside

from D.C.  Id. 98:2-7.  Thus, based on the record, including the remark attributed to Caparoso, a

reasonable jury could find that Caparoso treated D.C. differently from other similarly situated

---

protection claim in certain situations, where a plaintiff shows that he was 'intentionally treated
differently from others similarly situated and that there is no rational basis for the difference in
treatment.'"  Flowers v. City of Minneapolis, Minn., 558 F.3d 794, 799 (8th Cir. 2009) (quoting
Village of Willowbrook v. Olech, 528 U.S. 562, 564-65, 120 S.Ct. 1073, 145 L.Ed.2d 1060
(2000) (per curiam)).  In Engquist v. Oregon Department of Agriculture, — U.S. —, 128 S.Ct.
2146 (2008), the Supreme Court held that this theory is not applicable in the public employment
context, where its nature "involve[s] discretionary decisionmaking based on a vast array of
subjective, individualized assessments" and "[i]n such situations, allowing a challenge based on
the arbitrary singling out of a particular person would undermine the very discretion that such
state officials are entrusted to exercise."  Yet, the Court explicitly found that if the allegation is
that certain discretionary actions occurred "on the basis of race or sex", an equal protection claim
would be adequately stated "because such discriminatory classifications implicate basic equal
protection concerns."  Id.  In this case, Plaintiffs clearly assert that Caparoso imposed such
suspensions on D.C. because of his race, and thus, even if Caparoso's conduct was classified as
involving discretionary decisionmaking, Plaintiffs adequately state an equal protection claim
here.
       Defendants also contend that D.C.'s "disability presented [a] unique situation and issues
in terms of his propensity for aggressive behavior and violence towards staff and other preschool
children."  Df. Reply at 5.  If, as Defendants appear to argue, D.C. was treated differently based
on his behavior and not his race, such a question of fact should be reserved for a jury to decide.

students by suspending him because of his race.

Therefore, taking the evidence in the light most favorable to the non-moving party, Plaintiffs have presented evidence that sets forth genuine issues of material fact as to whether Caparoso, acting in his official capacity as Vice Principal of Franklin Park Elementary School, deprived D.C. or caused him to be deprived of his right to Equal Protection under the Fourteenth Amendment of the United States Constitution and the NJLAD.  See West v. Atkins, 487 U.S. 42, 48 (1988); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970); Sample v. Diecks, 885 F.2d 1099, 1107 (3d Cir. 1989).  Accordingly, Defendants' Motion to dismiss Plaintiffs' § 1983 and NJLAD claims against Caparoso is denied.

### C.    Plaintiffs' § 1985 Claims Against Defendants

Defendants also challenge Plaintiffs ability to demonstrate that Defendants engaged in a conspiracy and violated § 1985(2).  Plaintiffs fail to present any evidence that Caparoso conspired with the School District to violate 42 U.S.C. § 1985(2), which involves obstructing justice by intimidating any party, witness, or juror.[22]  Thus, Plaintiffs fail to present a genuine issue of material fact with respect to their § 1985 claims against Defendants.

Further, because Plaintiffs fail to bring any actionable claims against the School District, the only remaining Defendant is Caparoso.  Because Caparoso is a single person, he is unable to conspire with himself in violation of § 1985.  See 42 U.S.C. § 1985; see also Rice v. President

---

[22]The Court notes that Plaintiffs likely meant to plead violations of 42 U.S.C. § 1985(3) in their Complaint.  However, Plaintiffs also fail to present any evidence that Caparoso conspired with the School District to deprive D.C. of his rights or privileges in violation of 42 U.S.C. § 1985(3).

and Fellows of Harvard College, 663 F.2d 336, 338 (1st Cir. 1981).  Accordingly, the Court

grants Defendants' Motion for Summary Judgment on Plaintiffs' § 1985 claims against

Defendants.


       **D.**      **Damages**

       Defendants contend that Plaintiffs are not entitled to punitive damages as a matter of law.

Citing City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981), Plaintiffs concede that a

municipal defendant is immune from punitive damages under § 1983 and states that the Court

should grant Defendants' request for summary judgment as to Plaintiffs' recovery under § 1983.

Similarly, punitive damages are not available against municipal employees when they are sued in

their official capacities.  See Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988).  Accordingly,

the Court grants Defendant's motion to dismiss the claim for punitive damages arising out of

Plaintiffs' § 1983 claims against the School District and Caparoso.

       Plaintiffs, however, may recover punitive damages under the NJLAD if they can

demonstrate that Caparoso's conduct was especially egregious and motivated by actual malice.

Rendine v. Pantzer, 141 N.J. 292 (1995) ("To warrant a punitive damage award, the defendant's

conduct must have been wantonly reckless or malicious.  There must be an intentional

wrongdoing in the sense of an 'evil-minded' act accompanied by a wanton and willful disregard

to the rights of another. . . ." Id. at 313.).  Defendants argue that this evil intent or reckless or

callous indifference to D.C.'s federally protected rights is not present here because Caparoso's

decision to suspend D.C. was made pursuant to a facially non-discriminatory school discipline

policy.  Defendants contend that the School District policy clearly permitted suspensions for the

actions of D.C.  Defendants also contend that D.C. was suspended for "good cause," specifically, the safety of D.C., the staff, and other students.  The Court disagrees with Defendants' arguments that this policy was clear-cut and that there was good cause to suspend D.C. in this case.

First, as discussed herein, the 2003-04 Code was silent as to the appropriateness or permissibility of suspending preschool children.  See Part III.B.2., supra; PX8.  Thus, any contention that this policy was clear-cut or that Caparoso was aware of what the policy was at the time of D.C.'s suspensions is not evident from the record before the Court.  Rather, Plaintiffs have raised a genuine issue of material fact as to whether the School District permitted suspensions of preschool disabled children in 2003 and whether Caparoso acted in accord with that policy.

Second, Plaintiffs dispute that there was good cause to suspend D.C. even if the School District policy permitted such suspensions.  Plaintiffs argue that Caparoso continued to suspend D.C. for his aggressive behavior, which was merely a manifestation of his disability.  In the School District evaluation, dated April 19, 2004, Caparoso and other team members determined that "based on data collected and observation of staff members whom [sic] work with [D.C.]; he does not appear to understand the consequences of his behavior"; that D.C. "displays impulsive behavior, resulting in aggressive acts, which he appears to be unable to control"; and D.C.'s "behavior, which resulted in a 9 day suspension is a manifestation of his disability."  PX21. Further, in an IEP evaluation on June 16, 2004, the School District again concluded that "D.C. has not yet demonstrated a definite understanding of cause and consequence of his actions." PX34 at 71.  Caparoso conceded that he did not have a reason to believe that D.C. even

understood the suspensions were intended to punish him.  Caparoso Dep. 58:11-23.[23]  Moreover, Westfield allegedly admitted that mistakes had been made in D.C.'s case.  Griffin Aff. ¶ 3; C. Clark Dep. 31:19-34:2, 83:9-23; D. Clark Dep. 84:17-85:15, 87:23-88:7.

Plaintiffs contend that the Daily Behavior Summaries demonstrate that D.C. was involved in several behavioral incidents, none of which resulted in formal disciplinary action or suspensions before Caparoso became involved.  See PX10; Pl. Facts ¶¶ 4-5.  According to Plaintiffs, after his involvement, Caparoso suspended D.C. from class for more than 16 days. Plaintiffs contend that Caparoso's issuing of two different Notices of Suspension on March 2, 2004 demonstrates that he manufactured the nature of the alleged incident on February 27, 2004 because the initial reason of "Disruptive Behavior" did not appear serious enough to justify suspension.  See PX14; Pl. Facts ¶ 5.  Plaintiffs also charge Caparoso with doctoring internal records – involving the March 24, 2004 and June 8, 2004 incidents – to show that D.C. was suspended for fewer days than actually imposed.  Pl. Facts ¶ 8 (citing PX20 & PX29).

In sum, Plaintiffs adequately demonstrate on this Motion that Caparoso did not have "good cause" for the suspensions, but rather, together with a racial comment attributed to Caparoso, his actions were a pretext for race discrimination.  See Rembert, 1997 WL 189318, at *6 n. 12.  Thus, based on the record before the Court, Plaintiffs present a genuine issue of material fact as to whether Caparoso's conduct exhibited the requisite evil intent or reckless or

───────────────

[23]Caparoso also testified that he was unaware of what was set forth in the 2003-04 Code, he was unaware that it was illegal from 2006 forward to suspend a preschool disabled child pursuant to N.J.A.C. 6A:14-2.8(a)(1), and he was unaware that the 2007-08 School District Code of Conduct ("2007-08 Code") expressly prohibited the suspension of a preschool disabled child until it was raised at his deposition in May of 2008.  Id. 16:6-18:13, 22:4-8; 23:16-25:10, 32:21-34:9; see Curley Aff., Ex. 28, 2007-08 District Code of Conduct ("PX28").

callous indifference to D.C.'s federally protected rights to award punitive damages in this case.

The jury has the duty to assess the amount of punitive damages, and such damages may be awarded even if the plaintiff cannot show actual damages.  Basista v. Weir, 340 F.2d 74 (3d Cir. 1965).  Because genuine issues of fact remain at this time with regard to Plaintiffs' claims, the Court is precluded from finding that at this time Plaintiff is not entitled to recover punitive damages as a matter of law.  See Santosuosso v. NovaCare Rehab., 462 F. Supp. 2d 590, 601 (D.N.J.2006) (denying summary judgment as to availability of punitive damages for NJLAD claims where issues of fact remained).  Accordingly, Defendants' Motion for Summary Judgment with respect to punitive damages for Plaintiffs' § 1983 claims is granted and for their NJLAD claims against Caparoso is denied.[24]

## IV.    CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment is granted in part and denied in part.  The Court grants Defendant's Motion with respect to all of Plaintiffs' claims against the

---

[24]Defendants also argue that Plaintiffs have failed to offer any testimony nor offered medical, psychological, or academic evidence to show damages as a result of the alleged conduct. Plaintiffs, however, claim that D.C. and his family suffered emotional distress at the time of the events in 2004 and there have been lingering effects on D.C.  Specifically, the Clarks testified that D.C. did not want to go to school, ride the bus, and suffered nosebleeds, he asked if he could stop going to school or go to his sister's school, D. Clark Dep. 104:22-107:10, and he is prone to panic attacks if he interprets the slightest indication that he could be in trouble.  C. Clark Dep. 40:4-41:13.  Since attending an out-of-district school that specializes in serving the needs of students, like D.C., who are prone to emotional and behavioral difficulties, D.C. has shown improvement in his disabilities.  Id. 35:16-36:8, 40:4-41:13; Df. Reply at 6.  D.C. has received awards, his achievements have been recognized, and he has not been suspended nor sent home for disciplinary reasons.  C. Clark Dep. 37:14-22; PX33.  At trial, Plaintiffs bear the burden of presenting evidence of all actual expenses incurred, such as medical or psychiatric expenses, and any damages due to pain and suffering, emotional distress, or damage to reputation.

Defendant School District and dismisses it from the case.  The Court also grants Defendants' Motion with respect to Plaintiffs' §§ 1981 and 1985 claims against Defendant Caparoso, but denies Defendants' request to dismiss Plaintiffs' § 1983 and NJLAD claims against Caparoso. The Court further grants Defendants' Motion with respect to Plaintiffs' request to seek punitive damages against Caparoso under § 1983, and denies their request under the NJLAD.


/s/   Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge


Dated:  June 4, 2009